No. 29,254.

E. J. Donnelly et al., *Appellants,* v. The Board of County Commissioners of the County of Atchison, *Appellee.*

(286 Pac. 250.)

Opinion filed April 5, 1930.

*William P. Waggener, J. M. Challiss* and *O. P. May,* all of Atchison, for the appellants.

*Lawrence F. Day,* of Atchison, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action by resident taxpayers of Atchison county to enjoin the board of county commissioners from levying a tax upon their property to raise funds to construct an insane ward as an addition to the county poor farm.

Various constitutional and statutory objections to such an undertaking were pleaded. The county board's demurrer to plaintiffs' petition was sustained, and the cause is here for review.

The constitution provides that institutions for the benefit of the insane, blind, and deaf and dumb, and such other benevolent institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be prescribed by law. (Art. 7, § 1.)

From this constitutional provision plaintiffs postulate that the care and maintenance of insane persons cannot be cast on the individual counties, and they argue how unjust it would be for the taxpayers of Atchison county to have to contribute, as they must do, to the support of the several state hospitals for the insane recruited from all over the state, and at the same time to have to pay for the erection of a county institution of the same sort to house Atchison county citizens who may be thus afflicted.

This argument would be more potent on the floor of the legislature than in the court room. The constitution contains another provision equally potent with the one quoted above. It reads:

"The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity, or other misfortune, may have claims upon the sympathy and aid of society." (Art. 7, § 4.)

This section of the constitution is just as broad and all-inclusive as the one relied on by plaintiffs, and the fair construction of both of them is that it is the duty of the state and also of the several counties to make suitable provision for the care of the insane, subject to such regulations "as may be prescribed by law." (Art. 7, §§ 1, 4.) These constitutional provisions, which are manifestly not self-executing (*State, ex rel., v. Deck,* 106 Kan. 518, 188 Pac. 238), virtually give the legislature a free hand to impose the cost of care and maintenance of mentally infirm persons upon the state or the counties or on both according to the lawmakers' notions of wisdom and expediency.

Plaintiffs' next objection to the threatened imposition of taxes to erect an insane ward at the county poor farm cannot be so readily disposed of. They contend that there is no statute conferring power upon the board of county commissioners to erect an insane asylum or ward on the county poor farm.

Counsel for the county board do not cite any statute which contains such grant of power in express terms, but our attention is directed to a number of statutory provisions from which counsel infer that the county board has power to carry out the project it has undertaken. The argument is to this effect: A statute, R. S. 76-1204 *et seq.,* provides for the temporary detention and custody of persons suspected of lunacy, for inquests in lunacy, and prescribes a procedure to secure the admission of lunatics into a state hospital for the insane. This statute also requires the state hospital authorities to advise the probate judge having jurisdiction of any such lunatic whether he can be received or not (R. S. 76-1213) ; and it is also provided that the county shall receive from the state a sum not to exceed two dollars per week for each destitute insane person in the county whose admission to the state hospital has been refused for want of room. (R. S. 76-1218.) Pursuant to the provision of statute just quoted, counsel for the county board directs our attention to the very substantial sums the state has had to pay to Atchison county in recent years for the care of destitute insane persons which the state hospitals could not receive:

```
Laws 1923, ch. 53 ....................................  $620
Laws 1925, ch. 21 ....................................  1,048
Laws 1927, ch. 68 ....................................  1,416
Laws 1929, ch. 68 ....................................  1,614
```

The two dollars weekly allowance was specified in the statute of 1901 (ch. 353, § 65), when costs of care and maintenance were much lower than at present, and it needs no evidence to advise this court that there is a wide disparity between what it costs Atchison county to care for the destitute insane in 1930 and the amount it receives from the state in reimbursement for such expenditures under the statute of 1901. However, the wisdom or expediency of the county building an annex to the poorhouse as a more economical method of caring for the destitute insane is not the question we have to decide. Our search is for statutory power to justify the county commissioners in what they propose to do. In *State, ex rel., v. City of Coffeyville,* 127 Kan. 663, 274 Pac. 258, the city sublet its

municipal airport to a private concern. In an action to enjoin the carrying out of the contract it was said:

"The fact that the unauthorized power which the official board or governmental agency assumes to exercise may be a good stroke of business will not justify it." (p. 667.)

In *State, ex rel., v. Bradbury,* 123 Kan. 495, 256 Pac. 149, where a school board sought to justify its unauthorized purchase of omnibuses to haul children to school rather than pay for their tuition in other schools more accessible, it was said:

"Touching the principal matters specially pleaded in defendant's answers—the alleged saving of the district's funds by the purchase and operation of the busses to carry to and from school the pupils who lived at a considerable distance therefrom rather than pay their tuition in other more convenient districts. . . . If the cost of paying tuition of some of the district pupils attending school in other districts is a lawful charge on the funds of the Labette county community high-school district and is more than it would cost to furnish transportation for such pupils to and from school in their own district, that is a matter which the legislature could and probably would correct if the fact were called to its attention. . . . However, we have to deal with the law as it is, not as it might be." (pp. 497, 498.)

We do not overlook that provision of the statute which says that where a person is adjudged to be insane the probate court shall enter a proper order for his disposition—

". . . Such order may discharge the patient with or without conditions, or remand him to the custody of his friends, or commit him to some hospital, public or private, in this state, or to a county insane asylum or the insane department of a county almshouse, if there be a county insane asylum or a department for the insane in the almshouse in the county where such alleged insane person resides." (R. S. 76-1214.)

The language quoted gives authority for the disposition of the lunatic. Manifestly this section of the statute has been inconsiderately copied *in haec verba* from the statute of some state where county insane asylums and almshouses, and insane departments in almshouses are in vogue. They do not exist in Kansas, and we must continue our quest for statutory authority for their construction—particularly for the construction of "an insane ward as an addition to the poor farm."

There is a statute which makes it the duty of the county to relieve and support all poor and indigent persons lawfully settled therein, whenever they shall stand in need thereof (R. S. 39-304), and of course insane persons who are poor and indigent are just as

much entitled to the benefit of this statute as any others. There is also statutory authority for the county board to acquire land and establish thereon an asylum for the poor, or for two or more counties to do so jointly (R. S. 39-324), and express authority is granted to employ a superintendent to conduct it and a physician to attend to it (R. S. 39-325, 39-326), and to levy taxes for its support (R. S. 39-324, 39-340). There is also statutory authority under which county buildings can be erected (R. S. 19-1501 *et seq.*); and R. S. 19-1801 authorizes counties like Atchison (population, 26,567; statistics of the state board of agriculture) to establish county hospitals. This summary of statutes may not be entirely complete, but it shows rather clearly, we think, that the authority of the county commissioners to levy taxes to construct county buildings—courthouses, poorhouses or asylums, hospitals and the like—is conferred by express provisions of statute; and very little, if any, authority to construct county buildings of any sort is vested in the board by mere implication. And as no explicit statutory authority to erect an insane ward as an addition to the present county poor farm exists, a majority of this court deems it imperative to hold that defendant's demurrer to plaintiffs' petition should have been overruled and that plaintiffs are entitled to the injunction for which they prayed.

It is so ordered.